# In the United States Court of Federal Claims

### No. 20-449C
### Filed: September 12, 2020

### Redacted Version Issued for Publication: October 1, 2020[1]

| | |
|---|---|
| * * * * * * * * * * * * * * * * | * |
| | * |
| **ASSET PROTECTION & SECURITY** | * |
| **SERVICES, L.P.,** | * |
| | * |
| Protestor, | * |
| | * |
| v. | * |
| | * |
| **UNITED STATES,** | * **Post-Award Bid Protest; Motion to** |
| | * **Dismiss; Standing; Trade-Off** |
| Defendant, | * **Analysis.** |
| | * |
| v. | * |
| | * |
| | * |
| **AKIMA GLOBAL SERVICES, LLC,** | * |
| | * |
| Defendant-Intervenor. | * |
| | * |
| * * * * * * * * * * * * * * * * | * |

  **David T. Ralston, Jr.** Foley & Lardner LLP, Washington, DC for protestor. With him were **Julia Di Vito and Frank Murray**, Foley & Lardner LLP, Washington, DC.

  **Daniel B. Volk,** Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for defendant. With him were **Douglas K. Mickle**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Ethan P. Davis**, Acting Assistant Attorney General, Civil Division. Of counsel was **Javier A. Farfan**, Associate Legal Advisor, United States Immigration and Customs Enforcement.

  **C. Peter Dungan**, Miles & Stockbridge P.C., Washington, DC for defendant-intervenor. With him were **Alfred M. Wurglitz** and **Annie M. McGuire**, Miles & Stockbridge P.C.

---

[1] This Opinion was issued under seal on September 12, 2020. The parties were asked to propose redactions prior to public release of the Opinion. This Opinion is issued with the redactions that the parties proposed in response to the court's request. Words which are redacted are reflected with the notation: "[redacted]."

**O P I N I O N**

**HORN, J.**

  In the above-captioned, post-award bid protest, protestor Asset Protection & Security Services, L.P. (Asset, also referred to as APSS) challenges the decision by the Department of Homeland Security, United States Immigration and Customs Enforcement (ICE) to award a contract to intervenor Akima Global Services, LLC (Akima, also referred to as AGS), arguing that the award was unreasonable, irrational, and arbitrary and capricious.

**FINDINGS OF FACT**

  On August 22, 2016, ICE issued a request for proposals for services, Solicitation No. HSCEDM-16-R-00001 (the Solicitation), to operate a detention center in Florence, Arizona. The Solicitation begins:

> SOLICITATION FOR GUARD, FOOD AND TRANSPORTATION SERVICES – FLORENCE SERVICE PROCESSING CENTER, FLORENCE AZ
>
> *Offerors must propose price/cost in order to be considered for award. Offerors who fail to propose price/cost will be eliminated from competition and will not be considered for award.

(capitalization in original).

  The August 22, 2016 Solicitation indicated that "[t]he price/cost will consist of one (1) Two-month transition period and one (1) Ten-month base period with seven (7) one-year option periods, followed by a six (6) months extension in accordance with FAR 52.217-8." The Solicitation, as evaluated, had four evaluation factors: (1) Demonstrated Technical/Management Capability, (2) Past Performance, (3) Administration, and (4) Price.[2] The December 19, 2019 Source Selection Award Decision Memorandum, as issued by the agency and signed by contracting officer serving as the source selection authority, explained:

> The four evaluation factors for this procurement are in descending order of importance.
>
> 1) Demonstrated Technical/Management Capability
> 2) Past Performance,

---

[2] The August 22, 2016 Solicitation indicated that "[t]here are three evaluation factors for this procurement: 1) Demonstrated Technical/Management Capability, 2) Past Performance, and 3) Price." Although the Solicitation, as amended, included four evaluation factors, with the addition of the evaluation factor of Administration, price was always an evaluation factor.

    3) Administration, and
    4) Price[.]

For Evaluation Factor 1 - Demonstrated Technical/Management Capability, offerors' proposals were to be evaluated on the "ability to fulfill the technical requirements while meeting quality requirements and the Offeror's business approach." Evaluation Factor 1 - Demonstrated Technical/Management Capability had four sub-factors: Sub-factor 1: Performance Work Statement; Sub-factor 2: Quality Control Plan; Sub-factor 3: Transition Plan; and Sub-factor 4: Staffing Plan. Evaluation Factor 1 and the Sub-factors for Evaluation Factor 1 were to be evaluated as: Outstanding, Good, Acceptable, Marginal, and Unsatisfactory. For Evaluation Factor 2 – Past Performance, offerors were required to submit three past performance contracts. Past Performance was to be evaluated as: Substantial Confidence, Satisfactory Confidence, Limited Confidence, No Confidence, or Unknown Confidence. Evaluation Factor 3 – Administration had four sub-factors: Sub-factor 1: Offer Letter; Sub-factor 2: Signed Solicitation Documents; Sub-factor 3: Small Business Subcontracting Plan; and Sub-factor 4: Key Personnel/Resumes. For Evaluation Factor 3 – Administration the offerors' proposals were evaluated for compliance with the four Sub-factors. Evaluation Factor 3 was to be rated as Pass, Fail, or Not Applicable. The final Evaluation Factor was Evaluation Factor 4 – Price, which "was not adjectively rated but considered a factor in the best value determination," and according to the Solicitation, "[o]fferors who failed to propose pricing were eliminated from competition and were not considered for award."

Consistent with the above, the Solicitation, as amended by Amendment 17, which was issued on May 28, 2019, indicated:

**Pricing**

The government is requesting a pricing quote from Offerors. Offerors are encouraged to provide reasonable, but competitive prices and submit pricing structures in accordance with the PWS [Performance Work Statement].

The pricing structure consists of one (1) sixty (60) day transition, One (1) ten (10) month base period and seven (7) one year options, followed by a six (6) month extension in accordance with FAR 52.217-8. If an award results from this solicitation, the Government intends to fund any Task Orders through annually appropriated funds.

Note: Pricing shall be submitted in the following two (2) areas:

1.) Section B of the solicitation (Standard Form 33/Optional Form 336);
2.) Attachment 5 CLIN [Contract Line Item Number] Summary

The Government expects that adequate price competition will result from this solicitation thereby negating the need for Offerors to submit certified

cost and pricing data (See FAR 15.403-1). A price analysis will be performed to assess the reasonableness of the proposed prices under the firm fixed price contract. The Government will conduct its price analysis using one or more of the techniques specified in FAR 15.404-1(b). However, in order to determine a fair and reasonable price in accordance with FAR 15.403-3(a)(1)(ii) and 15.403-5(b)(2), the Government shall require other than certified cost and pricing data in responses to this RFP.

. . . .

**Contingency Pricing:**
All proposed pricing must be accordance with [FAR] 52.222-43. Any form of contingency pricing is unacceptable and your proposal will be removed from competition as unresponsive.

(emphasis in original) (brackets added).

As indicated in the Source Selection Award Decision Memorandum:

All Sub-factors under Factor 1 were rated with equal importance. The Demonstrated Technical/Management Capability (Factor 1) is more important overall than Past Performance (Factor 2). Evaluation Factors 1 and 2 are more important that Evaluation Factor 3 (Administration). When combined, Demonstrated Technical/Management Capability, Past Performance, and Administration, are significantly more important than Price (Factor 4).

On December 5, 2016, the agency issued Amendment No. 5 to the Solicitation, which answered questions raised by prospective offerors. Question 246 asked: "Arizona charges 4.5% 'business tax'; will the Federal Government issue a tax exemption certificate to the successful offeror?" to which the agency responded: "Yes."

There were six offerors to the Solicitation, including protestor Asset, intervenor Akima, and AKHI, LLC (AKHI). The initial award was made to Akima on September 26, 2018. As indicated in the December 19, 2019 Source Selection Award Decision Memorandum for the award currently being protested, "[t]he Government received two GAO [Government Accountability Office] protests of award; one from APSS and one from AKHI respectively. AKHI submitted a Supplemental Protest to GAO as well. All protests were dismissed by GAO due to the Government's willingness to take corrective action." The GAO dismissed those protests on November 9, 2018.

After the agency agreed to take corrective action, on May 21, 2019, the agency issued Amendment 16 to allow discussions with the offerors, and four offerors, including protestor Asset, intervenor Akima, and AKHI, submitted timely, revised proposals by May 30, 2019. After review of the offerors' proposals, on May 31, 2019 the agency issued Amendment 19 to clarify the agency's answers to Question 236 and Question 246, the

4

questions and answers the agency had previously provided. Regarding Question 246, Amendment 19 stated:

> Question#246: Arizona charges 4.5% "business tax"; will the Federal Government issue a tax exemption certificate to the successful offeror?
>
> Initial Government Response: Yes
>
> Corrected Government Response: The Government CANNOT delegate its tax exempt status to contractors for the performance of government services.

(capitalization in original). Also on May 31, 2019, the agency sent an email to Asset which stated: "Attached is Amendment 0019 concerning HSCEDM-16-R-00001. Please review the documentation and respond accordingly." The same day, May 31, 2019, [redacted], the Vice President of Contract Administration & Business Development for Asset emailed the agency and stated: "I have reviewed, signed and attached Amendment 19 hereto. Asset's proposal does not require further revision." On June 4, 2019, the agency issued Amendment 20, to provide further "clarification to the pricing proposed by Offerors and to Question 236 and Question 246 of the Questions and Answers." Amendment 20 reiterated the language of Amendment 19, and stated, with regards to Question 246:

> 2. Provide clarification to question and answer.
>
> Question#246: Arizona charges 4.5% "business tax"; will the Federal Government issue a tax exemption certificate to the successful offeror?
>
> Initial Government Response: Yes
>
> Corrected Government Response: No, the Government CANNOT delegate its tax exempt status to contractors for the performance of government services.

(capitalization in original). Also on June 4, 2019, the agency sent an email to Asset which stated: "Attached is Amendment 0020 concerning HSCEDM-16-R-00001. Please review the documentation and respond accordingly. Required documents are due by Wednesday June 5, 2019 at 1100 EST." The same day, June 4, 2019, [redacted] emailed the agency and stated: "Asset has reviewed it [sic] price proposal in response to Amendment 20. No changes are deemed necessary." Asset's price proposal, therefore, continued to remain unchanged, and Asset's price proposal stated:

> Other Direct Costs have been included in the development of the fully-loaded CLIN rates included in Section B. These costs represent the total cost of providing office equipment, training, medical testing, transportation vehicles and equipment, uniforms, duty gear, weapons, ammunition, communications equipment, detainee tracking and accountability system,

administrative supplies, detention services, food service, certifications and licenses, and management to the labor force, inclusive of all shipping fees, & handling or processing fees. Sales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable.

On August 21, 2019, the agency again issued the award to the intervenor Akima. The agency notified protestor Asset of the award on the same day and subsequently provided Asset with an August 28, 2019 debriefing letter. The August 28, 2019 debriefing letter informed Asset it was not eligible to receive the award because of defective pricing in its proposal, and stated:

APSS was ineligible to receive award due to defective pricing. In accordance with the solicitation "All proposed pricing must be in accordance with 52.222-43. Any form of contingency pricing is unacceptable and your proposal will be removed from competition as unresponsive." APSS offered contingency pricing on pg. 57 of their Volume IV proposal. APSS stated "sales taxes were not charged due to the Government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable." The Government provided two amendments, 0019 and 0020, informing all Offerors that the Government will not provide the tax-exempt number and APSS failed to make the correction.

On September 3, 2019, Asset timely filed a second GAO bid protest.[3] Subsequently, the agency again indicated its intent to take corrective action, and on October 1, 2019, the GAO dismissed Asset's September 3, 2019 protest. Thereafter, on November 21, 2019, the agency issued Amendment 21. Amendment 21 stated:

The purpose of Amendment 0021 to HSCEDM-16-R-00001 is to incorporate WD 2015-5469, Rev.-10, dated August 2, 2019 into the solicitation.

1.      Offerors are only allowed to provide updates to their pricing in Volume IV. Offerors shall not alter any narratives. Updates to the pricing in Volume IV are due November 25, 2019 at 0900 EST.
2.      Offerors need to confirm that their proposals are valid through April 2020.

(capitalization in original). On November 21, 2019, [redacted] responded to the agency: "Asset confirms that its proposal is valid through April 30, 2020," and confirmed that "[n]o

---

[3] As with the previous protest at GAO, another unsuccessful offeror also filed a bid protest with GAO.

changes to pricing that were not caused by the new Wage Determination were made." [4] Asset's final proposal, stated, in language that was unchanged from its earlier May 2019 proposal, "Asset is submitting this proposal as a Firm Fixed Price Proposal, inclusive of the Transition Period, Base Period, all Option Periods, and the potential 6 month Extension. We provided pricing for each Cost Line Item Number in this Price Proposal in Section B and Attachment 5." Also unchanged from its May 2019 proposal, Asset's pricing proposal, stated: "Sales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable."

Three offerors submitted timely responses after the corrective action: protestor Asset, intervenor Akima, and AKHI, and the agency evaluated the three offerors. The Source Selection Award Decision Memorandum provides the following evaluation summary for the three offerors:

**Evaluation Factor 1: Demonstrated Technical/Management Capability FPR[[5]]**

| Offeror | PWS | Quality Control Plan | Transition Plan | Staffing Plan | Overall Rating |
|---------|-----|---------------------|-----------------|---------------|----------------|
| AGS | Outstanding | Outstanding | Outstanding | Outstanding | Outstanding |
| APSS | Outstanding | Outstanding | Outstanding | Outstanding | Outstanding |
| AKHI | Outstanding | Outstanding | Outstanding | Outstanding | Outstanding |

**Evaluation Factor 2: Past Performance FPR –** Offerors were not required to submit a new Past Performance Volume if no weaknesses or deficiencies were identified. No Offeror submitted a new Past Performance Volume.

| Offeror | Past Performance Rating |
|---------|------------------------|
| AGS | Satisfactory Confidence |
| AKHI | Satisfactory Confidence |
| APSS | Satisfactory Confidence |

**Evaluation Factor 3: Administration FPR**

| Offeror | Cover Letter | Signed Solicitation Documents | Small Business Plan | Key Personnel/Resumes |
|---------|--------------|-------------------------------|---------------------|-----------------------|
| AGS | P | P | P | P |
| AKHI | P | P | N/A | P |
| APSS | P | P | P | P |

(emphasis in original). The December 19, 2019 Source Selection Award Decision Memorandum indicated:

---

[4] Protestor stated in the complaint, "Asset complied with Amendment 21, and on November 21, 2019, timely submitted a revised price proposal revising only its pricing and not its price narrative (as specifically instructed by ICE)."

[5] The Solicitation states that FPR stands for "Final Proposal Revision."

| Period of Performance | Period of Performance Dates |
|---|---|
| Transition Period (60 Days) | 09/26/2018 - 11/26/2018 |
| Base Period (10 months) | 11/27/2018 - 09/25/2019 |
| Option Period 1 | 09/26/2019 - 09/25/2020 |
| Option Period 2 | 09/26/2020 - 09/25/2021 |
| Option Period 3 | 09/26/2021 - 09/25/2022 |
| Option Period 4 | 09/26/2022 - 09/25/2023 |
| Option Period 5 | 09/26/2023 - 09/25/2024 |
| Option Period 6 | 09/26/2024 - 09/25/2025 |
| Option Period 7 | 09/26/2025 - 09/25/2026 |
| Option Period 8 | 09/26/2026 - 03/25/2027 |

After identifying the periods of performance, the December 19, 2019 Source Selection Award Decision Memorandum noted "[t]he IGCE [Independent Government Cost Estimate] was calculated from historical contract analysis, the current contract, and an escalation based on prevailing wage determinations and CBAs [Collective Bargaining Agreements]." The Source Selection Award Decision Memorandum continued:

The Total IGCE is as follows:

| Period of Performance | IGCE |
|---|---|
| Transition Period (60 Days) | $4,250,126.03 |
| Base Period (10 months) | $21,250,630.20 |
| Option Period 1 | $31,363,431.07 |
| Option Period 2 | $32,145,016.78 |
| Option Period 3 | $32,946,142.20 |
| Option Period 4 | $33,767,295.35 |
| Option Period 5 | $34,608,977.36 |
| Option Period 6 | $35,471,701.74 |
| Option Period 7 | $36,355,994.74 |
| Option Period 8: FAR 52.217-8 | $18,631,197.00 |

**Extended Services:** The contract will include FAR 52.217-8 "Option to Extend Services" for an additional six (6) months of services; if necessary. The total estimated value of the effort is $280,790,512.47.

(emphasis in original). The Source Selection Award Decision Memorandum provides the following evaluation summary regarding pricing:

**Evaluation Factor 4: Price Analysis FPR**

| Offeror | Proposed Price | Price Percentage Differential |
|---|---|---|
| AKHI | $263,413,870.66 | Lowest Offer |
| APSS | $273,697,209.72 | 3.903% |
| AGS | $276,950,519.31 | 5.138% |

(emphasis in original). In addition, the agency performed a best value trade-off analysis, and as explained in the December 19, 2019 Source Selection Award Decision Memorandum:

Award was made through a trade-off evaluation in accordance to the evaluation process used to select the proposal that represents the best value to the Government as described above and based on these four categories:

1) Demonstrated Technical/ Management Capability (Factor 1),
2) Past Performance (Factor 2),
3) Administration (Factor 3), and
4) Cost/Price (Factor 4).

The Source Selection Award Decision Memorandum further explained:

The Government intends to award to the Contractor's proposal that represents the overall best value to ICE in accordance with the Solicitation's award selection process. The best value determination was made by comparing the differences in the factor ratings and price and conducting a trade-off analysis of benefits of superior abilities and probability of successfully performing the contract versus the added cost. The best value determination is determining when a superior technical capability is offered that outweighed significantly higher overall costs.

AGS, APSS, and AKHI were evaluated and received the highest technical rating "Outstanding"; AKHI's proposal offered the lowest price. APSS' offered the second lowest price. AGS's proposal offered the highest price.

A trade-off analysis of the difference in the ratings between AGS and APSS and AGS and AKHI was conducted in accordance with the Solicitation's Evaluation to determine the best value.

Before comparing the proposals, however, the agency concluded that:

APSS is ineligible to receive award due to defective pricing. APSS offered contingency pricing on pg. 57 of their Volume IV proposal. APSS stated "sales taxes were not charged due to the Government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable." The Government provided two amendments, 0019 and 0020, informing all Offerors that the Government will not provide the tax-exempt number and APSS failed to make a correction to their price proposal. Nevertheless, the Government performed a tradeoff analysis in accordance with the solicitation.

The December 19, 2019 Source Selection Award Decision Memorandum has a detailed breakdown in the trade-off section regarding each element of the proposals. For the Evaluation Factor 1: Demonstrated Technical/Management Capability, the Source Selection Award Decision Memorandum indicated: "AGS 'Outstanding' proposal offers overall best value above APSS' Outstanding proposal. AGS provides a superior technical

capability over APSS." For Evaluation Factor 2 – Past Performance, the Source Selection Award Decision Memorandum stated: "**Past Performance Determination** Both AGS and APSS received a Satisfactory Confidence level. The Government has an equal reasonable expectation that the both Offerors will successfully perform." (capitalization and emphasis in original). For Evaluation Factor 3 – Administration, the Source Selection Award Decision Memorandum stated: "Both AGS and APSS were rated overall 'Pass.'" For Evaluation Factor 4 – Price, the Source Selection Award Decision Memorandum stated:

**Factor 4 – Price**

The Government conducted its price analysis using one or more of the techniques specified in FAR 15.404-1(b) as per the solicitation. The Government utilized FAR 15.404-1(b)(2)(i) and determined that the prices offered by both AGS and APSS are fair and reasonable based on adequate competition. The Government outlines this analysis below:

| Offeror | FPR Price | Price Percentage Differential |
|---|---|---|
| APSS | $273,697,209.72 | N/A |
| AGS | $276,950,519.31 | 1.119% |

(capitalization and emphasis in original).[6] The Source Selection Award Decision Memorandum explained:

Additionally, the evaluated price will be based upon the provision of a monthly rate for guaranteed minimum of 392 detainee beds each day (i.e., FPC[7] capacity of 392) and a bed day rate for detention services for the housing and care of up to an additional 320 detainees above the guaranteed minimum (i.e. Florence Staging Facility capacity of 320). Offerors shall propose a monthly rate for CLINs X002A which assumes full capacity at FPC and a bed day rate for detainees in custody above the guaranteed minimum for CLINs X002B.

In accordance with the solicitation, The [sic] Government has generated a bed day rate comparison based on the 392 GM [Guaranteed Minimum] bed CLIN for AGS and APSS based on their proposed 392 GM pricing. [redacted]

The trade-off analysis between protestor Asset and intervenor Akima concluded: "**Trade-Off Determination:** The Government has determined that AGS offered superior

---

[6] The court notes that the Akima's price as listed in the trade-off analysis with Asset is different than the one listed in the trade off analysis with AKHI or in the final Source Selection decision.

[7] "FPC" is not defined in the record before the court. "FDC," however, is defined in the Solicitation as the Florence Detention Facility.

solutions/approach to APSS, as determined though the evaluation factors, merits a higher price, and therefore represents the best value to the Government." (capitalization and emphasis in original).

The trade-off analysis in the Source Selection Award Decision Memorandum concluded:[8]

PART IV: SOURCE SELECTION

| Offeror | Demonstrated Technical/Management Capability FPR | Past Performance | Administration | Price |
|---------|--------------------------------------------------|------------------|----------------|-------|
| AGS | Outstanding | Satisfactory Confidence | Pass | $276,950,519.31 |
| APSS | Outstanding | Satisfactory Confidence | Pass | $273,697,209.72 |
| AKHI | Outstanding | Satisfactory Confidence | Pass | $263,413,870.66 |

The results of the above consensus ratings revealed the following:

1. AGS, APSS, and AKHI all received an overall rating of 'Outstanding' in the most important evaluation factor, Factor 1, Demonstrated Technical/Management Capability. However, upon further analysis the Outstanding ratings are not equal. AGS provides the best value to the Government in terms of their proposed Demonstrated Technical/Management Capability, Quality Control Plan, Transition Plan, and Staffing Plan.

2. Based on the evaluation of Factor 2, Past Performance, all vendors received a Satisfactory Confidence rating. Based on the submitted contracts from vendors, the Government has a reasonable expectation that the Offerors will successfully perform.

---

[8] The Source Selection Award Decision Memorandum also provided a comparison between AKHI and intervenor Akima, in a similar format to the comparison between Asset and Akima. The price evaluation in the trade-off analysis between AKHI and Akima stated:

| Offeror | FPR Price | Price Percentage Differential |
|---------|-----------|-------------------------------|
| AGS | $276,656,452.43 | N/A |
| AKHI | $263,168,313.44 | 5.138% |

(capitalization and emphasis in original). The trade-off analysis between AKHI and Akima concluded: "**Trade-Off Determination:** The Government has determined that AGS offered superior solutions/approach to AKHI, as determined though the evaluation factors, merits a higher price, and therefore represents the best value to the Government," (capitalization and emphasis in original). The trade-off analysis between AKHI and Akima, however, is not an issue before the court.

3. All Offerors were rated "Pass" for all subfactors in Evaluation Factor 3. AKHI was the only vendor that received a "N/A" for the "Utilization of Small Business" due to the Offeror being a Small Business.

4. For Factor 4, Price, AKHI offered the lowest Total Evaluated Price at $263,413,870.66 but offered the second highest bed day rate; [redacted], and the lowest above GM bed day rate, [redacted]. The second lowest Offeror, APSS, offered pricing that was $10,283,339.06 (3.903%) higher than the lowest price but offered the highest bed day rate; [redacted], and highest above GM [redacted]. However, APSS' pricing was determined to be noncompliant with the solicitation requirements. APSS offered contingency pricing on the belief that the Government would provide their tax-exempt certification number. The Government provided two amendments, 0019 and 0020, informing all Offerors that the Government will not provide the tax-exempt number and APSS failed to make a correction to their final pricing after amendments 0019 and 0020 were issued. AGS offered pricing that was $13,536,648.65 (5.138%) higher than the lowest price; but offered the lowest bed day rate; [redacted], second highest above GM bed day, [redacted]. All proposed prices, to include options, were evaluated and determined fair, balanced and reasonable.

5. Based on my review of the specific individual strengths and the evaluated factors, AGS offers the best value to the Government. This determination was reached in accordance with the "Award Selection" criteria and based on the evaluation process established in the solicitation. All Offeror's [sic] received an overall "Outstanding" rating. However, AGS provides the best value to the Government in terms of their proposed Demonstrated Technical/Management Capability, Quality Control Plan, Transition Plan, and Staffing Plan. All Offeror's [sic] were rated with a 'Satisfactory Confidence' level in Past Performance. All Offerors were rated 'Pass' or N/A in all subfactors in Administration. Given the 'Outstanding' rating in Factor 1, coupled with the specific strengths found within Factor 1, [sic] - Demonstrated Technical /Management Capability, the 'Satisfactory Confidence' in Factor 2 - Past Performance, , [sic] Factor 3 - Administration, 'Pass' ratings for all subfactors, and fair and reasonable price for Factor 4 - Price, AGS represents the best value to the Government. I reviewed all Technical proposals and conducted trade-off for a price premium with two Offerors who were technically acceptable that had a lower price than AGS (APSS and AKHI). Based on my review and in accordance with the Solicitation's requirements, after conducting the required trade-off and based on the demonstrated strengths, AGS's technical offer warrants a price premium.

6. In summary, based on my integrated assessment of all proposals in accordance with the specified evaluation factors, sub-factors and award

selection process, it is my decision that Akima Global Services' proposal offers the best overall value to the Government.

(capitalization in original). The Source Selection Award Decision Memorandum concluded with the following recommendation: "Based upon the above findings, in accordance with FAR Part 15, the Contracting Officer recommends to the Source Selection Authority (SSA) that award be made to Akima Global Services in the amount of $276,950,519.31."

The same day as the December 19, 2019 Source Selection Award Decision Memorandum was issued, the agency awarded the contract, for a third time, to intervenor Akima. Protestor Asset filed a third GAO protest, and argued to the GAO that the agency unreasonably had determined that protestor's proposal was ineligible due to a price contingency. Additionally, Asset argued that the agency's evaluation and trade-off analysis for Evaluation Factor 1: Demonstrated Technical/Management Capability, and specifically Sub-factors 1, 3, and 4 were unreasonable. Asset claimed that they were assessed a weakness under Sub-factor 1: Performance Work Statement that intervenor was not assessed a weakness for despite being identical to protestor. Asset claimed it has superior past performance, although it was given the same rating as intervenor. Finally, Asset alleged the best value trade-off "was based on arbitrarily determined benefits without the required consideration of the qualitative value of the individual benefits found in each offeror's proposal, and that the best value tradeoff lacked a specific explanation of why Akima's allegedly technically superior proposal merited the price premium over Asset's proposal."

On April 6, 2020, the GAO issued a decision denying Asset's protest. See generally Asset Prot. & Sec. Servs., L.P., B-417024.6, 2020 WL 1847740 (Comp. Gen. Apr. 6, 2020). Regarding the Asset's price proposal, the GAO concluded:

On this record, we do not find reasonable the agency's conclusion that the above-quoted statement in Asset's price proposal created a contingency, or took exception to the solicitation's requirements to propose a fixed price. While we agree that Asset's price proposal may have relied on an incorrect pricing assumption, on this record, we do not find that Asset's price proposal conditioned its fixed price on future negotiations. Further, to the extent that the solicitation expressly required the inclusion of state sales taxes, Asset's proposal might reasonably be viewed as incomplete, however, nothing in the proposal supports the agency's conclusion that Asset's pricing was contingent on future negotiations. Nonetheless, we conclude that the protester was not prejudiced by the agency's error.

Id. at *5 (footnote omitted).[9]

_____

[9] Asset's bid protest complaint notes that the GAO also found that the agency's evaluation and trade-off analysis between Asset and Akima with respect to Sub-factors 1, 3, and 4 for Evaluation Factor 1: Demonstrated Technical/Management Capability, and Evaluation Factor 2: Past Performance, were reasonable.

Thereafter, Asset filed a bid protest complaint in this court. In Count 1, Asset states Amendments 19 and 20 "subsequently stated ICE would not provide tax-exempt certificates to the successful contractor. In response to these Solicitation amendments, Asset signed the amendments (acknowledging that ICE would not provide tax-exempt certificates) and stated that it did not deem any changes necessary to its previously provided fixed prices." Asset claims:

> The SSA [Source Selection Authority], nonetheless, repeatedly seized on Asset's statement that it had not charged sales taxes, based on the government's previously expressed intent to provide a tax-exempt certificate, to unreasonably conclude that Asset offered contingency pricing. The SSA further repeatedly concluded that this alleged contingency pricing rendered Asset's price noncompliant with the Solicitation requirements and ineligible for award.

> The SSA's evaluation and conclusion that Asset's proposal was ineligible for award were unreasonable because Asset's proposed price did not contain a pricing contingency, but instead contained only a pricing assumption. Asset's proposal contained no indication that its firm-fixed-price would change if its pricing assumption proved incorrect, and Asset did not reserve a right to receive, or even request, an adjustment to its pricing based on the stated pricing assumption about tax-exempt certificates.

In its complaint, Asset also argues that the agency's evaluation of the price proposals was arbitrary and capricious, alleging

> Asset was prejudiced by the SSA's unreasonable determination that Asset's proposal contained a pricing contingency, as the SSA expressly found, based on the erroneous pricing contingency conclusion, that Asset's proposal was noncompliant with the Solicitation and ineligible for award. While the SSA then nominally included Asset's proposal in the best value tradeoff, and referred therein in passing to Asset's proposal as "technically acceptable," the SSA conducted the price/technical best value tradeoff analysis: (1) simultaneously with expressly determining that ICE could not award to Asset because its proposal was ineligible for award, (2) in the wake an August 2019 determination to the same effect, and (3) without providing a record or explanation that the SSA's unreasonable determination had changed. Based on ICE's own record, then, the SSA performed, without explanation, a purported "best value tradeoff" in which one proposal deemed eligible for award was considered against another that the SSA simultaneously (and previously) deemed ineligible for award. Absent an explanation in the record as to how or why the SSA changed the finding as to Asset's ineligibility, conducting such tradeoff between Asset's and Akima's proposals when the SSA had already determined Asset's proposal to be ineligible for award is facially unreasonable.

In addition, regarding the best value trade-off analysis, protestor claims that the Source Selection Award Decision Memorandum did "not even state the price difference between Asset's and Akima's grand total price proposals, and does not evidence any comparison of Asset's grand total price against Akima's grand total price, other than noting that Akima's price was the highest of the three offerors included in the best value tradeoff,"[10] and the agency "gave little or no consideration to the fact that Asset offered a lower grand total price as compared to Akima, as that price advantage was not specifically considered at all during the best value tradeoff." Therefore, "[t]he best value tradeoff, which was impermissibly premised on a finding that Asset's proposal was ineligible for award and a pricing evaluation that included unit pricing, was flawed and not determined in accordance with the Solicitation."

Count 2 of Asset's complaint claims that the agency's evaluation of the technical proposals was arbitrary and capricious. In Count 3, Asset argues that the past performance evaluations were flawed, because the agency "failed to substantively compare Asset and Akima's proposals under the Past Performance factor, and instead concluded that the proposals were equivalent merely because each was assigned an adjectival rating of Satisfactory Confidence under the Past Performance factor." In Count 4, Asset alleges that "ICE's overall decision to award the contract to Akima was unreasonable, arbitrary, and capricious," and argues that "ICE failed to follow the Solicitation's prescribed method of determining the best value offeror, and its conclusion that Akima's proposal presents the best value to the government was not reasonable or adequately documented."

In addition, to the above four counts in the complaint, Asset stresses it has standing "because it was an actual bidder whose direct economic interest is affected by the award of the contract to Akima." Asset claims that it's proposal "was highly rated and lower priced as compared to Akima's proposal, and Asset's proposal was considered as one of just three proposals in the best value tradeoff conducted by ICE." Therefore, according to protestor, "[b]ut for the errors in ICE's evaluation and best value tradeoff, there is a substantial chance that Asset would have received the contract award under the Solicitation."

---

[10] The court notes that the December 19, 2019 Source Selection Award Decision Memorandum calculated the price percentage difference between Asset and Akima's price proposals, as well as listed the three offerors' grand total price proposals in the trade-off analysis. As indicated above:

PART IV: SOURCE SELECTION

| Offeror | Demonstrated Technical/Management Capability FPR | Past Performance | Administration | Price |
|---------|--------------------------------------------------|------------------|----------------|-------|
| AGS | Outstanding | Satisfactory Confidence | Pass | $276,950,519.31 |
| APSS | Outstanding | Satisfactory Confidence | Pass | $273,697,209.72 |
| AKHI | Outstanding | Satisfactory Confidence | Pass | $263,413,870.66 |

After Asset filed its bid protest, the court held an initial hearing. At the hearing, the defendant and intervenor Akima argued that protestor Asset lacked standing to bring this protest. After discussions with the parties, the court ordered the parties to brief the jurisdictional issue of standing. Defendant argues that "Asset failed to submit a proposal that conformed to the Solicitation's terms." Akima also contends "Asset's Proposal was noncompliant because it contained a contingency that took exception to the RFP's requirement for a firm-fixed price," and "[o]fferors that submit noncompliant bids lack standing because they do not have a substantial chance of being awarded the Contract." (capitalization in original). Asset responds that both motions to dismiss should be denied because Asset has standing to bring its bid protest in this court.

## DISCUSSION

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always raise the issue of their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481,

1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) (2018) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996, codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); see also Eskridge & Assocs. v. United States, 955 F.3d 1339, 1345 (Fed. Cir. 2020) ("In a post-award bid protest, the relevant inquiry is whether the bidder had a 'substantial chance' of winning the award—specifically, whether a protestor 'establish[ed] not only some significant error in the procurement process, but also that there was a substantial chance it would have received the contract award but for that error.'" (quoting Statistica, Inc. v. Christopher, 102 F.3d 1577, 1582 (Fed. Cir. 1996))) (alteration in original); Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1317; AECOM Mgmt. Servs., Inc. v. United States, 147 Fed. Cl. 285, 290 (2020); Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d at 1308; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order

to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In a post-award bid protest, such as the above-captioned bid protest, the "protestor must 'establish that it (1) is an actual or prospective bidder, and (2) possesses the requisite direct economic interest.'" Mgmt. & Training Corp. v. United States, 137 Fed. Cl. 780, 783-84 (2018) (quoting Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006)); see also Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) ("An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. Thus, a party must show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest."); AECOM Mgmt. Servs., Inc. v. United States, 147 Fed. Cl. at 290; PAE-Parsons Global Logistics Servs., LLC v. United States, 145 Fed. Cl. 194, 198 (2019); Timberline Helicopters, Inc. v. United States, 140 Fed. Cl. 117, 120 (2018); Contract Servs., Inc. v. United States, 104 Fed. Cl. 261, 269 (2012).

As noted above, in response to defendant's and intervenor's motions to dismiss, Asset argues that Asset has standing "because it was an actual bidder whose direct economic interest is affected by the award of the contract to Akima." Asset claims its proposal "was highly rated and lower priced as compared to Akima's proposal, and Asset's proposal was considered as one of just three proposals in the best value tradeoff conducted by ICE," which "[b]ut for the errors in ICE's evaluation and best value tradeoff, there is a substantial chance that Asset would have received the contract award under the Solicitation." Asset also argues that defendant's and intervenor's claims that Asset submitted a non-responsive bid, and, therefore, lacks standing to bring the above captioned protest, are flawed. Asset's pricing proposal, states, in part:

Other Direct Costs have been included in the development of the fully-loaded CLIN rates included in Section B. These costs represent the total cost of providing office equipment, training, medical testing, transportation vehicles and equipment, uniforms, duty gear, weapons, ammunition, communications equipment, detainee tracking and accountability system,

administrative supplies, detention services, food service, certifications and licenses, and management to the labor force, inclusive of all shipping fees, & handling or processing fees. Sales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable.

Defendant argues:

The solicitation, as amended, asked for proposals to provide the stated services on the condition that ICE would not grant a tax exemption certificate. Asset submitted a proposal in which it directly contradicted that condition. Instead of submitting pricing that would be valid without a tax exemption certificate, Asset expressly premised its pricing proposal on receiving the tax exemption that the solicitation ultimately said would not be provided. Asset's proposal was therefore not in a form that ICE could have accepted for award of this contract.

Similarly, intervenor Akima contends "[p]laintiff's proposal contains a pricing assumption that contradicts the RFP's plain direction that the Agency will not issue tax exemptions," and "[a]s this makes Plaintiff's proposal ineligible for award, Plaintiff has no standing to protest the Agency's source selection decision."

The Federal Circuit has stated that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech. Grp., Inc. v. United States, 649 F.3d 1320, 1329 (Fed. Cir. 2011) (quoting E.W. Bliss Co. v. United States, 77 F.3d 445, 448 (Fed. Cir. 1996)); see also Centech Grp., Inc. v. United States, 554 F.3d 1029, 1039 (Fed. Cir. 2009) (holding that a proposal that did not offer to provide what the request for proposals requests was not responsive to the request for proposals); Gen. Dynamics Mission Sys., Inc. v. United States, 137 Fed. Cl. 493, 521-22 (2018); Prescient, Inc. v. United States, 125 Fed. Cl. 475, 491 (2016). In Centech, the Federal Circuit further explained,"[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." Centech Grp., Inc. v. United States, 554 F.3d at 1037. "'A solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal].'" Transatlantic Lines, LLC v. United States, 122 Fed. Cl. 624, 632 (2015) (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. 488, 505 (2009)) (brackets in original). As explained in ManTech Advanced Systems International, Inc. v. United States, 141 Fed. Cl. 493 (2019):

Material requirements are those necessary in order for a proposal to "provide the exact thing called for in the request for proposals[.]" Bus.

Integra, Inc. v. United States, 116 Fed. Cl. 328, 333 (2014) (quoting Centech Grp., 554 F.3d at 1037). Thus errors are considered to be material when they (1) violate an express provision in the RFP and (2) the provision served a substantive purpose. Id. at 333-36. A substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid. . . . So long as the requirement serves a substantive purpose, it is material. See Strategic Bus. Sol'n, Inc. v. United States, 129 Fed. Cl. 621, 629-30 (2016) (holding that the requirement to redact parts of a proposal was material because it "served a substantive purpose"), aff'd, 711 Fed. Appx. 651 (2018).

ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 507.

Moreover, "[w]aiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision." L-3 Commc'ns EO Tech., Inc. v. United States, 83 Fed. Cl. 643, 653 (2008). Although, "[w]here a defect in a bid is trivial or a mere formality, not material, the bid is not required to be rejected out of hand." M.W. Kellogg Co./Siciliana Appalti Costruzioni S.p.A. v. United States, 10 Cl. Ct. 17, 26 (1986); see also E.W. Bliss Co. v. United States, 77 F.3d at 449.

As described above, on December 5, 2016, the agency issued Amendment No. 5 to the Solicitation, which answered questions raised by prospective offerors. Question 246 asked: "Arizona charges 4.5% 'business tax'; will the Federal Government issue a tax exemption certificate to the successful offeror?" The agency responded: "Yes." In Asset's pricing proposal, regarding "Development of Other Direct Costs," the proposal stated:

> Other Direct Costs have been included in the development of the fully-loaded CLIN rates included in Section B. These costs represent the total cost of providing office equipment, training, medical testing, transportation vehicles and equipment, uniforms, duty gear, weapons, ammunition, communications equipment, detainee tracking and accountability system, administrative supplies, detention services, food service, certifications and licenses, and management to the labor force, inclusive of all shipping fees, & handling or processing fees. Sales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable.

As indicated in the December 19, 2019 Source Selection Award Decision Memorandum, after taking corrective action and "[a]fter a full review of the Offeror's [sic] proposals, the Government issued Amendment 0019 to the solicitation on May 31, 2019, to provide clarification to the pricing proposed by Offerors and to Question 236 and Question 246 of the Questions and Answers." As described above, Amendment 19 stated, in part:

Question#246: Arizona charges 4.5% "business tax"; will the Federal Government issue a tax exemption certificate to the successful offeror?

Initial Government Response: Yes

Corrected Government Response: The Government CANNOT delegate its tax exempt status to contractors for the performance of government services.

(capitalization in original). Subsequently, on June 4, 2019, the agency issued Amendment 20, to provide further "clarification to the pricing proposed by Offerors and to Question 236 and Question 246 of the Questions and Answers." Amendment 20 stated, in part:

2. Provide clarification to question and answer.

Question#246: Arizona charges 4.5% "business tax"; will the Federal Government issue a tax exemption certificate to the successful offeror?

Initial Government Response: Yes

Corrected Government Response: No, the Government CANNOT delegate its tax exempt status to contractors for the performance of government services.

(capitalization in original). Both Amendment 19 and Amendment 20 clearly stated that "the Government CANNOT delegate its tax exempt status to contractors." (capitalization in original). Asset, however, chose not make any changes to its pricing proposal after the issuance of Amendment 19 or Amendment 20. Moreover, on May 31, 2019, after the issuance of Amendment 19, Asset's Vice President of Contract Administration & Business Development, [redacted], emailed the agency and stated: "I have reviewed, signed and attached Amendment 19 hereto. Asset's proposal does not require further revision." Similarly, on June 4, 2019, after the issuance of Amendment 20, [redacted] emailed the agency and stated: "Asset has reviewed it [sic] price proposal in response to Amendment 20. No changes are deemed necessary." As noted above, after the agency issued Amendment 19 and Amendment 20, the agency issued Amendment 21 on November 21, 2019, which stated:

1. Offerors are only allowed to provide updates to their pricing in
2. IV. Offerors shall not alter any narratives. Updates to the pricing in Volume IV are due November 25, 2019 at 0900 EST.
3. Offerors need to confirm that their proposals are valid through April 2020.

On November 21, 2019, in response to Amendment 21, [redacted] responded: "Asset confirms that its proposal is valid through April 30, 2020," and confirmed that "[n]o changes to pricing that were not caused by the new Wage Determination were made."

Therefore, Asset's price proposal retained the language that "[s]ales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable."

On multiple occasions the agency attempted to make the operative tax-exemption issue clear after including the opposite information in the Solicitation as originally issued and in an early question and answer supplied to the offerors. The agency gave the offerors multiple opportunities to revise language related to their price proposals in light of the change to the availability of the offerors' ability to claim the government's tax-exempt certificates by issuing Amendment 19 and Amendment 20. Even with the issuance of Amendment 21, offerors were given another chance to update their pricing, albeit not in their narratives. After the agency issued Amendment 21, protestor did not raise any concerns to the agency, and as before in response to Amendment 19 and 20 simply sent the agency a brief message from [redacted] which did not change the language regarding the tax-exempt certification, and which confirmed "[n]o changes to pricing that were not caused by the new Wage Determination were made."

As noted above, in Allied Technology Group, Inc. v. United States, the Federal Circuit indicated that "'a proposal that fails to conform to the material terms and conditions of the solicitation should be considered unacceptable and a contract award based on such an unacceptable proposal violates the procurement statutes and regulations.'" Allied Tech. Grp., Inc. v. United States, 649 F.3d at 1329 (quoting E.W. Bliss Co. v. United States, 77 F.3d at 448). The Federal Circuit in Centech Group, Inc. v. United States, explained that "[t]o be acceptable, a proposal must represent an offer to provide the exact thing called for in the request for proposals, so that acceptance of the proposal will bind the contractor in accordance with the material terms and conditions of the request for proposals." Centech Grp., Inc. v. United States, 554 F.3d at 1037 (citing E.W. Bliss Co. v. United States, 77 F.3d at 448). A Judge of the United States Court of Federal Claims, citing to Centech Group, held that "[i]t is blackletter law that a procuring agency may only accept an offer that conforms to the material terms of the solicitation." Furniture by Thurston v. United States, 103 Fed. Cl. 505, 518 (2012). Therefore, if the tax-exempt issue was material to the Solicitation, Asset's proposal was on its face unacceptable and could not be chosen for award.

As also noted above, "'[a] solicitation term is material where it has more than a negligible impact on the price, quantity, quality, or delivery of the subject of the [proposal].'" Transatlantic Lines, LLC v. United States, 122 Fed. Cl. at 632 (quoting Blackwater Lodge & Training Ctr., Inc. v. United States, 86 Fed. Cl. at 505) (brackets in original); see also Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 40 (2010), aff'd, 649 F.3d 1320 (Fed. Cir. 2011). As indicated by the Judge in ManTech Advanced Systems International, Inc., "errors are considered to be material when they (1) violate an express provision in the RFP and (2) the provision served a substantive purpose," and "[a] substantive purpose is something important to the government's evaluation of the offer, is binding on the offeror, or has a more than negligible impact on the price, quantity, or quality of the bid." ManTech Advanced Sys. Int'l, Inc. v. United States, 141 Fed. Cl. at 507 (citing Bus. Integra, Inc. v. United States, 116 Fed. Cl. 328, 333-36 (2014)).

Defendant cites to <u>Business Integra, Inc. v. United States</u>, for the proposition that the <u>Business Integra</u> protestor's omission in its price proposal was not eligible for award even though the "omitted prices would have amounted to only 0.0041% of the projected Total Value of its proposal." <u>Bus. Integra, Inc. v. United States</u>, 116 Fed. Cl. at 334. The court notes that the solicitation in <u>Business Integra, Inc. v. United States</u> explicitly stated that "the omission of even a single labor rate, no matter its significance, 'will result in a material non-conformity.'" <u>Id.</u> at 331.

Intervenor Akima states that for "Asset's failure to include the 4.5% sales tax in its proposal, the exclusion has to be far 'more than a negligible impact on price.'" (quoting <u>Allied Tech. Grp., Inc. v. United States</u>, 94 Fed. Cl. at 40). Defendant also cites to the undersigned's decision in <u>Constellation West, Inc. v. United States</u>, 125 Fed. Cl. 505 (2015), which concluded that the Defense Intelligence Agency could properly exclude an offeror whose mistake in filing in the cells in its pricing proposal would have increased the offeror's total price by only "'8/1,000ths of one percent.'" <u>See</u> <u>id.</u> at 548.

Asset argues that defendant's motion to dismiss "repeatedly omits the crucial caveat at the end of Asset's cost estimating assumption—that ICE would be providing a tax-exempt certificate '*where applicable.*'" (emphasis in original). Protestor claims

> [t]he revised answer to Question #246 communicated that a tax-exempt certificate would not be applicable anywhere. Thus, read on its face *and in its entire, unedited form*, Asset's cost-estimating assumption is not at odds with the revised answer, because Asset never claimed to be basing its ODC calculation on the receipt of a tax-exempt certificate *where one was not applicable*.

(emphasis in original). Defendant responds that "[t]he construction Asset now espouses, in an effort to read the non-conforming statement out of its proposal, does not make sense under the facts of the case. At no relevant time was the question of whether ICE would provide a tax exemption certificate left indeterminate." Defendant notes that "[w]hen proposals were originally due, the solicitation indicated that the exemption certificate would be provided. Later, the solicitation was changed to unequivocally state that the certificate would not be issued, and the Government would not delegate its tax exempt status." (internal refence omitted). Intervenor Akima similarly states: "Plaintiff's Response attempts to argue that two words – 'where applicable'– render its pricing assumption challenging the Agency's stated intention not to issue tax exemption certificates a legal nullity. However, Plaintiff's argument would read two words [where applicable] to the exclusion of the balance of its proposal." (brackets added). Akima emphasizes that "Asset cannot demonstrate how the phrase 'where applicable' qualifying Asset's statement that 'Sales taxes were not charged due to the government's expressed intent to provide a tax-exempt certificate' would have any meaning when ***a tax-exempt certificate would never be applicable***." (emphasis in original).

Notably, the language at issue is not just the "where applicable" statement, as the entire sentence in Asset's price proposal states: "Sales taxes were not charged due to

the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable." Asset's price proposal, after the issuance of Amendment 19 and Amendment 20, and Amendment 21, still assumed that the government had the "expressed intent to provide Team Asset with a tax-exempt certificate, where applicable," and, therefore, Asset's price appeared to continue to anticipate tax-exemption certificate opportunities. The agency had originally given the offerors the impression that the Solicitation as issued would allow for a tax-exemption certificate. Question 246 asked: "Arizona charges 4.5% 'business tax'; will the Federal Government issue a tax exemption certificate to the successful offeror?" to which the agency responded: "Yes." Asset did not change its proposal even after the government made clear that there would be no tax-exemption certificates available to the offerors. Amendment 19 and Amendment 20 are explicit and do not leave open the possibility of any tax-exemption certificate, as the amendments emphasize: "the Government CANNOT delegate its tax exempt status to contractors for the performance of government services." (capitalization in original). Here, it was an error for Asset to continue to include the tax-exemption language in its pricing proposal after the government clarified multiple times that an offeror could not include any tax-exempt opportunities regarding pricing in its proposal. As defendant argues, "[i]n this case, the requirement that proposals acknowledge that a state tax exemption certificate would not be issued was material because it was a substantive part of the contract to be awarded, necessarily affecting contract pricing." By way of analogy, in ManTech Advanced Systems International, Inc. v. United States, 141 Fed. Cl. 493, cited above, the Judge noted that "there can be no question that proposing an additional labor category would affect DOJ's [Department of Justice's] price evaluation. Section 1.3.5 in ManTech's proposal is reasonably read to mean that DOJ would be liable for management and labor costs not included on ManTech's price tables." Id. at 509. The Judge in ManTech Advanced Systems International, Inc. continued,

> because ManTech was an incumbent DOJ may have just as reasonably concluded that the additional labor category and associated costs proposed in Section 1.3.5 are necessary for program performance. In short, DOJ rationally concluded that ManTech was proposing to add costs to any contract it received that were outside the requirements of the RFP and thus ManTech had made a material error in its proposal.

Id. (internal reference omitted). The failure to take into consideration that there absolutely would be no tax-exemption certificate, necessarily had an impact on Asset's proposed firm-fixed price bid. The tax-exemption issue, therefore, had a material impact on the price of Asset's bid, with the protestor still contemplating opportunities to seek future tax exemptions.

Asset argues that "[a]s this Court has held, an offeror's price assumptions that do 'not reserve, explicitly or implicitly, a right on [the offeror's] part to alter its pricing' do not require rejection of the offer or render it ineligible for award." (quoting Harmonia Holdings Grp., LLC v. United States, 136 Fed. Cl. 298, 312 (2018)) (emphasis and brackets in original). Asset continues, "[r]ather, such 'assumptions serve no function other than to provide a more complete picture of how [the offeror] came up with its pricing.'" (quoting Harmonia Holdings Grp., LLC v. United States, 136 Fed. Cl. at 312) (brackets in original).

The decision in Harmonia by another Judge of the United States Court of Federal Claims is the only case that protestor cites for this argument. In Harmonia, protestor Harmonia Holdings Group, LLC (Harmonia) challenged the Federal Transit Administration's (FTA's) conclusion that Optimal Solutions and Technologies, Inc. (OST) offered the best value to agency, and that OST's proposal was superior to that of Harmonia. See id. at 302. As explained by the Judge in Harmonia:

> Harmonia and OST were among five bidders for an information technology service contract; the bidders were evaluated on their technical proposals and price quotations to determine which provided the best value to FTA. Of the two, Harmonia submitted the less expensive quotation but OST's proposal received a higher technical rating. The Agency determined that OST, despite its relatively higher price, provided the best value and awarded OST the contract in July 2016.

Id. One of Harmonia's arguments was that the FTA improperly failed to reject OST's price quotation as ineligible for award. The Judge in Harmonia explained:

> OST's price quotation included various assumptions, such as, "[t]he [g]overnment will provide OST timely access to facilities required for the completion of the work aligned with this contract," and "[t]he [g]overnment will provide OST timely access to staff and [s]ubject [m]atter [e]xperts . . . required for the completion of the work assigned during this contract." Harmonia argues that such assumptions "take exception to the firm-fixed-price nature of the [proposal]," which "places the risk . . . [of work] exceed[ing] the estimated level of effort" on the contractor. Although the assumptions were not included in the terms of the awarded contract, Harmonia claims that they still reserve to OST "the right to a price adjustment any time it encounters [anything] . . . not specifically identified in the [statement of work]."

Id. at 312 (internal references omitted; brackets in original). The Judge in Harmonia concluded:

> Here, there is nothing in the record to support the assertion that OST's assumptions are anything more than an "illustrat[ion] that OST understood the [s]olicitation's requirements and the scope of the work." Despite Harmonia's assertions to the contrary, none of OST's assumptions reserve, explicitly or implicitly, a right on OST's part to alter its pricing. . . . OST's assumptions serve no function other than to provide a more complete picture of "how OST came up with its pricing."

Id. (internal references omitted). As intervenor Akima notes, "[t]he court found it unremarkable that the awardee expected the government to provide required resources and facilities," assumptions unrelated to a potential price change, and as such the assumptions in Harmonia did not change the nature of its price proposal. The reservation in Asset's price proposal, "[s]ales taxes were not charged due to the government's

expressed intent to provide Team Asset with a tax-exempt certificate, where applicable," however, was part of Asset's price proposal and did not align with the requirements of the amended Solicitation and demonstrates a misunderstanding of the pricing requirements of the amended Solicitation by Asset.

Asset further suggests that if the agency believed the tax-exemption language in Asset's price proposal was inconsistent with the Solicitation, as amended, "'[t]he way to deal with that problem is to seek clarification of those prices, not to punish the bidder by disqualifying it.'" (quoting Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1564 (Fed. Cir. 1996)). The court notes that the Data General decision is the only decision that protestor cites for this argument.[11] The facts in the protest currently under review, however, are different than those in Data General. The protestor in Data General argued that "GSA [General Services Administration] could and should have disqualified IBM because of the discrepancies in its pricing tables." Data Gen. Corp. v. Johnson, 78 F.3d at 1564. The Data General protestor was challenging the decision of the GSA's Board of Contract Appeals denying its protest of GSA's award of a contract to International Business Machines Corporation (IBM). As noted by the Federal Circuit, "[t]he principal issue is whether the Board correctly held that Data General was not entitled to relief because it did not show that it had suffered prejudice as a result of any alleged improprieties in the procurement process." Id. at 1558. The United States Court of Appeals for the Federal Circuit explained:

> [i]n 1992, GSA solicited proposals to provide extensive automatic data processing equipment and related supplies and services for the United States Forest Service. The solicitation stated that the proposals would be separately evaluated with respect to technical and cost factors. The technical evaluation would be based upon four items, each of which was further subdivided. The solicitation stated that the agency's source selection authority "'will determine the proposal which provides the best overall value to satisfy Government needs'" and that the technical assessment would be "significantly more important" than cost.

Id. (internal refences omitted). The GSA indicated five offerors were in the competitive range, including IBM and Data General. See id. The GSA had discussions with the five offerors and allowed the offerors to submit best and final offers. See id. The Federal Circuit indicated,

> [u]pon review of the companies' submissions, a GSA contracting officer noted several pricing discrepancies in IBM's BAFO [best and final offer]. Specifically, the tables showing special pricing provisions (B tables) provided for beginning dates for two discounts that differed from the dates indicated in another table that showed expected contract life cycle cost (L table) and in the automated files IBM submitted with its BAFO. The

---

[11] Akima points out in a footnote that "*Data General Corp.* also was decided a year before the effective date of the FAR Part 15 Rewrite, which gave agencies greater discretion and flexibility over the conduct of discussions. 62 Fed. Reg. 51,224, 51,228 (Sep. 30, 1997)."

> beginning dates of these discounts had a substantial effect on the overall
> cost of the proposal.

Id. (internal references omitted). According to the Federal Circuit, "[t]he contracting officer by telephone requested IBM to give two yes-or-no answers about what the dates should be," and IBM's "answers resulted in a substantially lower overall contract cost than would have resulted under the dates stated in the B tables." Id. at 1558-59. The Federal Circuit explained:

> Applying the revised beginning-discount dates to IBM's proposal, GSA then
> compared the BAFOs of the five companies with respect to both the cost
> and the technical areas. Data General's BAFO was substantially higher than
> IBM's. Data General's technical score was slightly higher than IBM's.
> Although the GSA source selection authority deemed the technical area
> "significantly more important than the Cost Area," it concluded that "IBM
> provides the best overall value to satisfy the Government's needs." GSA
> awarded the contract to IBM in June 1994.

Id. (internal refences omitted). As the defendant in the above captioned protest observed, in Data General, "[t]he contracting officer elected to exercise the discretion afforded to contracting officers to clarify the matter, and the Federal Circuit rejected a challenge to the contracting officer's election to proceed in that manner."

Unlike the situation in Data General in which IBM's price proposal was internally inconsistent, Asset's price proposal was unchanged with regard to the tax-exemption, even in the face of multiple amendments by the agency to clarify the tax-exemption issue and even after the agency gave the offerors an opportunity to adjust their pricing if necessary. Asset's final proposal did not conform with the requirements of the Solicitation, as amended because Asset's proposal before and after Amendment 19 and Amendment 20 still was based on receiving a tax exemption, "where applicable," and the Amendments to the Solicitation explicitly stated in capital letters "the Government CANNOT delegate its tax exempt status to contractors for the performance of government services." (capitalization in original). The language included by protestor, "where applicable," cannot save Asset from a price proposal that remained unchanged even when a correction to the Solicitation via Amendment 19 and Amendment 20 to the Solicitation clarified that an offeror could not rely on a tax-exemption in its pricing proposal, and after the agency even gave the offerors yet another opportunity to update their pricing information by Amendment 21. As defendant notes:

> Perhaps if Asset had elected to revise its prices in response to Amendment
> No. 19 or 20, one might have had cause to wonder if the narrative statement
> was simply left in by mistake. But the manner in which Asset both left its
> pricing unchanged and left its narrative unchanged indicated-at least to any
> objective reader-that Asset had simply failed to do what the amended
> solicitation requested-namely, provide pricing that was not based on the
> expectation of receiving a tax exemption certificate.

(footnote omitted).

Although the agency could have contacted Asset like the contracting officer contacted IBM in Data General, ICE did not do so. It is the obligation of the offeror to provide a complete proposal to the agency that allows the agency to evaluate the proposal as written. The government does not have an obligation to contact an offeror for further clarification after receipt of a proposal. See Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. 735, 744 (2009) ("Plaintiff's failure to provide more detailed information is chargeable to it alone."). As noted by a Judge of the United States Court of Federal Claims, "'[a]n offeror has the responsibility to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'" KSC Boss All., LLC v. United States, 142 Fed. Cl. 368, 382 (2019) (quoting Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. at 744); see also Mission1st Grp., Inc. v. United States, 144 Fed. Cl. 200, 213 (2019) (quoting Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. at 744) ("It is axiomatic that the burden is on the offeror 'to submit a well-written proposal with adequately detailed information that allows for a meaningful review by the procuring agency.'"); Mercom, Inc. v. United States, 131 Fed. Cl. 32, 40 (2017). As explained by the Judge in Mission1st Group,

> the bottom line is that the agency had no way of knowing for sure why the cost narrative and cost proposal were inconsistent with one another. It was not irrational or unreasonable for the agency to decline to choose which of the two cost proposals (or perhaps some third alternative) reflected Mission1st's actual intent.

Mission1st Grp., Inc. v. United States, 144 Fed. Cl. at 213; see also Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. at 744. Therefore, after giving all the offerors, including Asset, multiple chances to change their price proposals, the agency was not obligated to reach out to Asset again to give Asset another opportunity to clarify its price proposal, especially when the agency did not give the other offerors another opportunity.

Asset also argues in its complaint that "Asset's proposal contained no indication that its firm-fixed-price would change if its pricing assumption proved incorrect, and Asset did not reserve a right to receive, or even request, an adjustment to its pricing based on the stated pricing assumption about tax-exempt certificates." By contrast, defendant argues that "[i]n our view, the suggestion that ICE should have-or even could have-ignored a blatant inconsistency between what Asset said in its proposal and what the solicitation said is out of step with any reasonable view of sound procurement practices." It would not have been proper for the agency to overlook Asset's inclusion of the tax-exemption in its price proposal. As noted by a Judge of the United States Court of Federal Claims, "[w]aiver of a mandatory requirement of the solicitation for the benefit of only one offeror invalidates a procurement decision." L-3 Commc'ns EO Tech., Inc. v. United States, 83 Fed. Cl. at 653. Moreover, as the Judge in the United States Court of Federal

Claims in <u>Business Integra</u> explained because protestor Business Integra's "error was material, the government was under no obligation to waive the error or allow Business Integra to correct the error. As the government points out, requiring the agency to waive Business Integra's error could result in disparate treatment among offerors and thus constitute an abuse of discretion." <u>Bus. Integra, Inc. v. United States</u>, 116 Fed. Cl. at 337 (citing <u>ST Net, Inc. v. United States</u>, 112 Fed. Cl. 99, 110 (2013) (internal reference omitted). [redacted], on behalf of Asset, repeatedly, and deliberately, conveyed to the agency protestor's intention to leave its price proposal unchanged, which resulted in protestor submitting a bid not compliant with the Solicitation as amended.

Additionally, intervenor Akima argues that "Asset's proposal contained a contingency that took exception to the RFP's requirement for a firm-fixed price, and was therefore noncompliant." As indicated above, the Solicitation stated: "Any form of contingency pricing is unacceptable and your proposal will be removed from competition as unresponsive." Intervenor Akima argues that "Asset's proposal offered a pricing contingency on the erroneous assumption that the Government would provide the successful offeror with a tax-exempt certificate."[12] Akima claims that Asset

> failed three times to revise its proposal to (1) remove any price contingencies and (2) remove any assumptions based on the Government's payment of Arizona's sales tax. Asset cannot now argue that the Agency's determination that it was ineligible for award was unreasonable. Accordingly, this Court should dismiss Plaintiff's Complaint for lack of jurisdiction because Asset does not have standing.

Asset responds that "[a] description of a pricing assumption is *not* an exception to the Solicitation's requirement for a firm fixed price," and "Asset does not state that the prices it proposed in the separate Pricing section of its price proposal are in any way conditional or contingent upon the receipt of a tax-exempt certificate." (emphasis in original). The court has determined that Asset submitted a bid to the agency that did not acknowledge the agency's repeated change regarding the unavailability of any tax exemption benefits. Asset retained its language in its price proposal that "[s]ales taxes were not charged due to the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable," even after the agency issued Amendment 19, Amendment 20, and Amendment 21, to the Solicitation which required a firm fixed price proposal, and provided no reliance on a possible tax-exemption certificates. The Solicitation, as amended, was clear: "All proposed pricing must be accordance with [FAR] 52.222-43. Any form of contingency pricing is unacceptable and your proposal will be removed from competition as unresponsive." (brackets added). Asset's price proposal, therefore, was unresponsive.

In addition to contesting the tax-exemption issue, protestor argues that

---

[12] In its reply brief, defendant states "[o]ur motion does not ask the Court to rule that ICE was correct to decide that Asset's proposal included a pricing contingency," and continues, "our motion argues that, even if Asset's price was firm and not contingent, that price was simply not what was requested in the solicitation."

[b]oth Motions [to dismiss brought by defendant and intervenor], although brought as jurisdictional challenges to Asset's standing, are improper jurisdictional/standing motions, as they fail to accept the Complaint's allegations of agency error as true for purposes of the motions, and are not directed to the issue pertinent to standing at this point in the protest, namely, allegational prejudice, which turns on the prejudicial *impact* of the agency's error as alleged in the Complaint.

(emphasis in original). Protestor states, "[a]s this Court specifically held in *Safeguard Base Operations, LLC,* demonstrating prejudice for standing purposes at this point in a protest requires *only* a showing of 'allegational prejudice,' *not* prejudice on the merits. 144 Fed. Cl. at 354." (emphasis in original). Protestor also cites to the language of the undersigned's bid protest decision in Caddell Construction Co., Inc. v. United States, 111 Fed. Cl. 49 (2013), that "[i]n order to establish what one Judge on this court has called 'allegational prejudice' for the purposes of standing, the bidder must show that there was a 'substantial chance' it would have received the contract award, but for the alleged procurement error," id. at 72 and "'[a]llegational prejudice' is to be judged before the court analyzes the lawfulness of the agency's allegedly improper action and 'turns entirely on the impact that the alleged procurement errors had on a plaintiff's prospects for award, taking the allegations as true.'" Id. at 111 (citations omitted). Intervenor responds that "the cases cited by Plaintiff are inapposite and should not control the outcome of this Motion." Asset overlooks the facts of the Caddell protest, as the undersigned in Caddell noted, "[i]n the above captioned protest, defendant and intervenor do not challenge plaintiff's standing." Id. Moreover, in the protest before the court, this court is not considering the "lawfulness of the agency's allegedly improper action," like the undersigned addressed in Caddell. Were the court to have found protestor's bid to be compliant with the Solicitation, the court would have taken the allegations that the technical evaluations, past performance evaluations, and price evaluations were arbitrary and capricious as with merit to determine if protestor could demonstrate allegational prejudice. Because the court did not conclude that protestor's proposal in the case currently before this court was in compliance with the terms of the Solicitation, the court did not reach the issue of allegational prejudice.

Regarding the Safeguard decision, the undersigned's bid protest decision in Safeguard did not involve the issue of allegational prejudice. See generally Safeguard Base Operations, LLC v. United States, 144 Fed. Cl. 304 (2019), appeal filed (Fed. Cir. Aug. 9, 2019). Instead, the undersigned examined the issue of whether or not Safeguard's joint venture agreement was in violation of the Small Business Administration's (SBA's) 8(a) joint venture requirements. See id. at 354. In order to determine standing, the undersigned carefully examined the record, and determined:

Based on the record before the court, including the inconsistencies between the three Safeguard 8(a) joint venture agreements and that the court does not have all of the records submitted to the SBA in connection with Safeguard's request to be approved as an 8(a) joint venture, the court is unable to evaluate B & O's [intervenor's] argument that the SBA erroneously

30

approved Safeguard's 8(a) joint venture agreement. As of the date on which Safeguard submitted its proposal in response to the Solicitation, however, Safeguard appears to have been approved by the SBA as an eligible 8(a) joint venture and appears to have been eligible to be selected as the apparent successful offeror under the Solicitation, if Safeguard had not been properly disqualified as a result of the Agency's alleged errors. Because the SBA approved Safeguard as an eligible 8(a) joint venture and because there is not sufficient evidence in the record to find that the SBA erred when approving Safeguard's 8(a) joint venture agreement, the court denies defendant-intervenor's motion to dismiss for lack of standing.

Id. at 363. Just as in the decision in Safeguard, the court does not reach the issue of allegational prejudice in this protest. In sum, protestor Asset does not have standing to challenge the agency's award to intervenor Akima.

Protestor also alleges that because the agency included Asset in its trade-off analysis, the agency "*waived* its unreasonable finding that Asset's proposal was ineligible for award." (emphasis in original). Asset argues that because "ICE included Asset's proposal in the best value tradeoff establishes ICE waived the finding of ineligibility and retained Asset's proposal among those eligible for award; therefore, Asset has standing to challenge the substance of the best value tradeoff and award determination." Protestor cites a single case for the statement of law that "[w]hen the agency's best value trade-off includes the protestor, even when it was not notionally the second-rated offeror, the protestor has established that it would have had a substantial chance of receiving the award but for the alleged error." Advanced Mgmt. Strategies Grp., Inc./Reefpoint Grp., LLC v. United States, 139 Fed. Cl. 404, 411 (2018) (footnote omitted). The court first notes that this statement does not demonstrate that an agency waived a finding that a proposal was ineligible for award by including a proposal in a trade-off analysis. The Judge in Advanced Management Strategies only indicated "the law will not assume it a *fait accompli* that the next highest rated proposal would receive the award. Plaintiff has established that there is a substantial chance that it might be awarded the contract if ERPi [the awardee] is not selected and it thus has standing to maintain the protest." Id. Indeed in Advanced Management Strategies, the protestor was determined to have a proposal that was compliant with the solicitation at issue. That is not the case in the above captioned bid protest. The December 19, 2019 Source Selection Award Decision Memorandum stated:

APSS is ineligible to receive award due to defective pricing. APSS offered contingency pricing on pg. 57 of their Volume IV proposal. APSS stated "sales taxes were not charged due to the Government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable." The Government provided two amendments, 0019 and 0020, informing all Offerors that the Government will not provide the tax-exempt number and APSS failed to make a correction to their price proposal. Nevertheless, the Government performed a tradeoff analysis in accordance with the solicitation.

In addition, the December 19, 2019 Source Selection Award Decision Memorandum indicated regarding the price analysis, "the APSS' pricing was determined to be noncompliant with the solicitation requirements. APSS offered contingency pricing on the belief that the Government would provide their tax-exempt certification number."

The court does not agree with protestor's contention that because Asset was included in the best value trade-off analysis, the agency waived any claim that Asset's proposal was ineligible for award. Regardless of the allegation, this court still would have the authority, and obligation, to determine if this court has jurisdiction to proceed and whether a protestor has standing to proceed after a protestor submitted a nonconforming bid. The United States Supreme Court has held that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. at 514 (quoting United States v. Cotton, 535 U.S. at 630). As the United States Court of Appeals for the Federal Circuit has explained, "any party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1346 (citing Arbaugh v. Y & H Corp., 546 U.S. at 506, Folden v. United States, 379 F.3d at 1354, and Fanning, Phillips & Molnar v. West, 160 F.3d at 720). As determined by this court, protestor does not have standing to bring this protest, and, therefore, this court does not have jurisdiction to hear this protest.

Finally, the court notes that protestor argues in its complaint the GAO determined "that the SSA's conclusion that Asset's proposal contained a price contingency, and was therefore ineligible for award, was unreasonable." The GAO decision discussed the positions urged by the parties and concluded:

> Asset contends that the agency erred in concluding that Asset's proposal was ineligible for award because the firm proposed "contingency pricing." The agency states that the solicitation expressly prohibited contingency pricing of any form. Further, the agency contends that it reasonably found Asset's proposal ineligible for award because Asset's price proposal included language that rendered its pricing contingent on an assumption that was no longer valid. Moreover, ICE asserts that Asset was not competitively prejudiced by any potential error related to the pricing issue because the SSA, nonetheless performed a best-value tradeoff analysis between Asset and Akima.
>
> In support of its conclusion that Asset's proposal contained contingent pricing, the agency explains that Asset's failure to remove language in its price proposal-that ICE informed offerors in two solicitation amendments was incorrect-rendered its price proposal contingent. Specifically, prior to the initial solicitation closing date, the agency originally advised offerors that the agency would issue a state sales tax exemption certificate to the successful offeror. During the course of the reevaluation performed in response to the earlier protests, ICE conducted discussions with offerors

and requested the submission of FPRs by May 30, 2019. Subsequent to the receipt of FPRs, the agency informed offerors, through the issuance of solicitation amendments 19 and 20, that ICE would not, in fact, issue the tax exemption certificate. Both amendments 19 and 20 permitted offerors to provide revisions to their price proposal submission based on the changes to the solicitation. The FPR, submitted on May 30, 2019 by Asset, explained that its fixed rates for each CLIN included other direct costs (ODC). Asset's FPR also stated that it did not apply sales taxes to the ODCs because it relied on "the government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable." In response to amendment 19 and 20, Asset stated that its proposal did not require further revision.

With regards to contingency pricing, the RFP, as amended, simply stated: "All proposed pricing must be in accordance with [FAR] 52.222–43. Any form of contingency pricing is unacceptable and your proposal will be removed from the competition as unresponsive." Relevant here, the SSA concluded that Asset's proposal was ineligible for award because the firm had failed to revise the statement in its FPR regarding the inclusion of state sales tax in its ODCs. The SSA found that the statement in Asset's price proposal was in violation of the solicitation's express prohibition about including of any form of contingency pricing.

In this regard, the agency maintains that Asset's failure to remove a pricing assumption in its proposal-an assumption that was no longer valid as a result of amendments to the solicitation-created a pricing contingency in Asset's proposal. In support of this argument, the agency relies on our decision in Solers, Inc., B–404032.3, B–404302.4, Apr. 6, 2011, 2011 CPD ¶83, where our Office found that the awardee made multiple statements in its proposal which amounted to the awardee conditioning its offered price on a greater use of government facilities than contemplated or authorized by the solicitation, such that the offered price was conditional, not firm. Id. at 6-7. According to the agency, Asset's proposal took exception to the solicitation's requirement to propose a fixed price because the solicitation, as amended, required offerors to include state taxes. By not including state taxes, the agency argues that Asset's price proposal took exception to the requirement to propose a fixed price because Asset conditioned its price on future negotiations.

Generally, the requirement to propose fixed prices is a material term or condition of a solicitation requiring such pricing. Marine Pollution Control Corp., B–270172, Feb. 13, 1996, 96–1 CPD ¶73 at 2–3. Where a solicitation requests proposals on a fixed-price basis, a price offer that is conditional and not firm cannot be considered for award. Id.; SunEdison, LLC, B–298583, B–298583.2, Oct. 30, 2006, 2006 CPD ¶168 at 5.

On this record, we do not find reasonable the agency's conclusion that the above-quoted statement in Asset's price proposal created a contingency, or took exception to the solicitation's requirements to propose a fixed price. While we agree that Asset's price proposal may have relied on an incorrect pricing assumption, on this record, we do not find that Asset's price proposal conditioned its fixed price on future negotiations. Further, to the extent that the solicitation expressly required the inclusion of state sales taxes, Asset's proposal might reasonably be viewed as incomplete, however, nothing in the proposal supports the agency's conclusion that Asset's pricing was contingent on future negotiations. Nonetheless, we conclude that the protester was not prejudiced by the agency's error.

Asset Prot. & Sec. Servs., L.P., 2020 WL 1847740, at *3-5 (internal references and footnote omitted).

The court first notes that while Judges of the United States Court of Federal Claims, including the undersigned, have high respect for the expertise of the GAO, and often consider the reasoning included in GAO decisions when reaching their own opinions, GAO decisions are not binding on the United States Court of Federal Claims. See Cleveland Assets, LLC v. United States, 132 Fed. Cl. 264, 280 n.15 (2017); see also Centech Grp., Inc. v. United States, 554 F.3d at 1038. Additionally, as defendant notes, "[e]valuating the tax-exemption issue as one of contingency pricing, which admittedly is how it was framed before GAO, overlooks the more basic problem: Asset's proposal failed to conform to a material term of the of the solicitation." Indeed, a focus of the GAO's conclusion was that Asset's pricing was not contingent, even as the GAO indicated that Asset's price proposal may be incomplete. As noted multiple times during this Opinion, this court has determined that Asset's price proposal itself was non-responsive to the requirements of the Solicitation, as explicitly amended more than once, and, therefore, the Asset's price proposal was non-complaint. The GAO failed to perform this first step of the analysis, and did not address if Asset's price proposal was responsive to the requirements of the Solicitation. The December 19, 2019 Source Selection Award Decision Memorandum stated:

APSS' pricing was determined to be noncompliant with the solicitation requirements. APSS offered contingency pricing on the belief that the Government would provide their tax-exempt certification number. The Government provided two amendments, 0019 and 0020, informing all Offerors that the Government will not provide the tax-exempt number and APSS failed to make a correction to their final pricing after amendments 0019 and 0020 were issued.

The agency, on multiple occasions, alerted the offerors to the change in the agency's earlier statement of the availability of a tax-exemption certificate, and tried repeatedly to ensure that the offerors' proposals did not reflect a reliance on the possibility of an available tax-exemption in their proposals. The GAO, in its focus on whether or not Asset's pricing was contingent on future negotiations, failed to fully consider if the price

proposal as submitted by Asset was sufficient on its face. As discussed above, the pricing requirements of the Solicitation made clear, "[a]ny form of contingency pricing is unacceptable and your proposal will be removed from competition as unresponsive." By keeping the language "sales taxes were not charged due to the Government's expressed intent to provide Team Asset with a tax-exempt certificate, where applicable," Asset conveyed to the agency that Asset's firm fixed price in its pricing proposal was subject to the condition that Asset would still be eligible to receive a tax exemption.

Additionally, as indicated above, regarding future negotiations, the GAO concluded:

> On this record, we do not find reasonable the agency's conclusion that the above-quoted statement in Asset's price proposal created a contingency, or took exception to the solicitation's requirements to propose a fixed price. While we agree that Asset's price proposal may have relied on an incorrect pricing assumption, on this record, we do not find that Asset's price proposal conditioned its fixed price on future negotiations. Further, to the extent that the solicitation expressly required the inclusion of state sales taxes, Asset's proposal might reasonably be viewed as incomplete, however, nothing in the proposal supports the agency's conclusion that Asset's pricing was contingent on future negotiations.

It is unclear why the GAO was focused on the issue of future negotiations, given that the agency's rejection of Asset's bid, as explained in the December 19, 2019 Source Selection Award Decision Memorandum, did not mention future negotiations, nor was the agency obligated to engage in future negotiations. See Structural Assocs., Inc./Comfort Sys. USA (Syracuse) Joint Venture v. United States, 89 Fed. Cl. at 744. The December 19, 2019 Source Selection Award Decision Memorandum, instead focused on the fact that Asset continued to include as a part of its price proposal for the fixed price contract an assumption that it could benefit from a tax-exemption certificate, and continued to do so although the agency had made clear that no such exemption would ever be available. In the court's view, the GAO was distracted by this future negotiations issue, and missed the larger issue of whether or not Asset's proposal, as submitted to the agency, was compliant with the stated requirements of the Solicitation, which was did not.

## CONCLUSION

As discussed above, protestor Asset submitted a non-responsive bid, and, therefore, lacks standing to bring the above captioned protest. The defendant's and intervenor's motions to dismiss are **GRANTED**. Protestor's protest is **DISMISSED**. The Clerk of the Court shall enter **JUDGMENT** consistent with this Opinion.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**